UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ALGONQUIN GAS TRANSMISSION, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiff, | | |
| v. | | Civil Action No. 17-10788-DJC |
| WEYMOUTH CONSERVATION COMMISSION, and the TOWN OF WEYMOUTH, | | |
| Defendants. | | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                              December 29, 2017

### I.      Introduction

Plaintiff Algonquin Gas Transmissions, LLC ("Algonquin") has filed this lawsuit against Defendants Weymouth Conservation Commission ("WCC") and the town of Weymouth, Massachusetts ("Weymouth") (collectively, "Defendants") seeking declaratory relief of federal preemption under the Natural Gas Act, 15 U.S.C. §§ 717 *et seq.* ("NGA") and the Pipeline Safety Act, 49 U.S.C. §§ 60101 *et seq.* ("PSA") ("Count I"), as well as a permanent injunction preventing Defendants from enforcing or relying upon an ordinance denying Algonquin's construction of a natural gas pipeline compressor facility ("Count II"). D. 1. Algonquin has moved for summary judgment, D. 7, and Defendants have moved to dismiss for failure to state a claim, D. 12. For the reasons stated below, the Court ALLOWS Algonquin's motion for summary judgment, D. 7, and DENIES Defendants' motion to dismiss, D. 12.

## II.     Standard of Review

### A.     Motion to Dismiss

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (internal citation omitted). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit. Id. Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the conduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011). In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103.

### B.     Motion for Summary Judgment

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986),

but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (quoting Anderson, 477 U.S. at 249) (alteration in original). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

### III.   Factual Background

The following facts are undisputed unless otherwise noted. Algonquin is a "natural gas company" as defined in the NGA, 15 U.S.C. § 717a(6). D. 7-1, ¶ 1. It is engaged in the transportation of natural gas in interstate commerce. Id. On January 30, 2015, Algonquin and Maritimes & Northeast Pipeline, LLC ("Maritimes") asked permission from the Federal Energy Regulatory Commission ("FERC") to use its Pre-Filing Process for approval of a natural gas pipeline and natural gas facilities construction project known as the Atlantic Bridge Project ("AB Project"). Id., ¶ 2. On February 20, 2015, FERC approved the request. Id. As a part of the AB Project, Algonquin seeks to construct a compressor station in the town of Weymouth (the "Weymouth Compressor Station"). Id., ¶ 3. The Weymouth Compressor Station is proposed to be built on land near the Fore River owned by Algonquin and on which Algonquin currently operates a pipeline and metering and regulating station. Id., ¶ 4.

On October 22, 2015, Algonquin and Maritimes filed an application for a Certificate of Public Convenience and Necessity ("Certificate") with FERC to receive approval to construct and operate the facilities proposed in the AB Project. Id., ¶ 5. Weymouth filed an unopposed petition to intervene in Algonquin and Maritimes' application process. Id., ¶ 6.

On May 2, 2016, FERC issued an environmental assessment for the AB Project, with a 30-day comment period. Id., ¶ 7. The environmental assessment addressed issues including (1) impact on wetlands, including that Algonquin would not permanently fill any wetlands; (2) safety of the Weymouth Compressor Station; (3) potential air quality, noise, and visual effects from the Weymouth Compressor Station; (4) risks of flooding or inundation of the land on which the Weymouth Compressor Station would be built. Id., ¶ 8. FERC concluded that any impacts it had identified relating to the AB Project could be mitigated, thus "support[ing] a finding of no significant impact." Id., ¶ 9. FERC concluded on this basis that an environmental impact study was not warranted. Id.

After issuing the environmental assessment, FERC received hundreds of comments, the majority of which were related to the Weymouth Compressor Station. Id., ¶ 10. After the comment period, on January 25, 2017, FERC issued a certificate authorizing the construction and operation of the AB Project (the "AB Certificate"). Id., ¶ 11. The Weymouth Compressor Station would be located in a "coastal zone" as defined by the Coastal Zone Management Act ("CZMA") affecting land regulated by the Massachusetts Coastal Management Program ("MCMP"). Id., ¶ 17. The AB Certificate requires Algonquin and Maritimes to seek a consistency certification with the CZMA before beginning construction of the Weymouth Compressor Station. Id., ¶ 18. The Massachusetts Office of Coastal Zone Management ("MCZM") is the agency primarily responsible for regulating the MCMP. Id., ¶ 19. The MCZM has published a policy guide to provide guidance on its policies and practices. Id. On October 23, 2015, Algonquin had submitted its consistency certification application. Id., ¶ 20. On August 3, 2016, MCZM proposed a one-year stay of the review period, and Algonquin agreed. Id., ¶¶ 22-23.

Weymouth has passed a Wetlands Protection Ordinance ("WPO")[1], intended to regulate Weymouth's wetlands above and beyond the regulations and procedures provided by the Massachusetts Wetlands Protection Act ("WPA"), Mass. Gen. L. c. 131, § 40.  Local conservation commissions like the WCC administer both the WPA and any relevant local ordinances like the WPO.  Id., ¶ 28.  Part of the property on which Algonquin and Maritimes intend to build the Weymouth Compressor Station is subject to the WPA and WPO.  Id., ¶ 25.  The AB Certificate encouraged Algonquin and Maritimes to cooperate with state and local authorities, but maintained that no "state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by" FERC.  Id., ¶ 26.  On February 22, 2016, Algonquin filed a Notice of Intent with the WCC seeking an Order of Conditions ("OOC") pursuant to the WPA and a WPO permit.  Id., ¶ 27.

The WCC held two public hearings on the Notice of Intent.  Id., ¶ 30.  On May 25, 2016, the WCC closed the public hearing and denied Algonquin's requests for an OOC and WPO permit. Id., ¶ 31.  On June 15, 2016, the WCC issued a written decision providing its reasons for denying the OOC and WPO permit.  Id., ¶ 32.  The WWC concluded in its decision that the construction of the Weymouth Compressor Station would threaten "resource areas and interest protected under the WPA and the WPO."  Id., ¶ 34.  This conclusion was based on the WWC's concerns about excessive risk of explosions, damage to the facility because of hurricanes, and negative effects due to odors, noise and "visual impacts."  Id.  On June 29, 2016, Algonquin filed a request for a Superseding Order of Conditions ("SOC"), overriding the WWC's decision, with the Southeast

---

[1] Weymouth Code of Ordinances ("WCO") § 7-301(b), available at http://www.weymouth.ma.us/sites/weymouthma/files/u481/code_of_ordinances_august_10_updated.pdf (last visited December 28, 2017).

Regional Office of the Massachusetts Department of Environmental Protection ("DEP").  Id., ¶ 35.  After the DEP issued an SOC to Algonquin, the WCC appealed the decision to the DEP's Office of Appeals and Dispute Resolution ("OADR").  Id., ¶¶ 37-38.  After the OADR began an adjudicatory proceeding, the DEP moved to stay the proceeding.  Id., ¶¶ 39-40.  The WCC supported the proposed stay, and Algonquin partially opposed it.  Id., ¶¶ 41-42.  The OADR presiding officer granted the stay, and then in response to a motion to vacate, extended the stay.  Id., ¶¶ 44-47.  The presiding officer explained that maintaining the stay was warranted until Algonquin and the WCC resolved their dispute about whether the WPO was preempted.  Id., ¶ 47.

## IV.  Procedural History

Algonquin commenced this case on May 4, 2017.  D. 1.  Algonquin has now moved for summary judgment, D. 7, and Defendants have moved to dismiss the complaint.  D. 12.  The Court heard oral argument on both motions and took the matters under advisement.  D 35.

## V.  Discussion

### A.  Algonquin's Claims Are Not Time-Barred

Defendants contend in support of their motion to dismiss that Algonquin's claim for declaratory relief is time-barred.  Defendants ask the Court to apply the sixty-day limitations period from the statute governing Massachusetts *certiorari* actions.  Mass. Gen. L. c. 249, § 4.  This statute is not applicable to Algonquin's claims.  "Certiorari is a limited procedure which may be used to correct substantial errors of law committed by a judicial or quasi-judicial tribunal (but not administrative, political, or legislative decisions)."  St. Botolph Citizens Comm., Inc. v. Boston Redev. Auth., 429 Mass. 1, 7 (1999).  "If the proceeding or hearing involves unsworn statements by interested persons advocating or disapproving the proposed new policy rather than sworn testimony by witnesses subject to cross-examination in a hearing preceded by specific charges, the hearing is more likely to be legislative or regulatory, rather than quasi-judicial, in nature."  School

6

Comm. of Hudson v. Board of Educ., 448 Mass. 565, 576 (2007) (internal quotation marks and citations omitted). In the WCC's order denying Algonquin's application for an OOC, it described the hearing it conducted, which included comments by the WCC, Weymouth government officials such as the mayor, and unidentified members of the public. D. 7-8 at 11-15. While the WCC kept a record of the persons who submitted written comments while the application was open, no transcript or minutes of the hearing are provided in the record. Id. The WCC's process "bore none of the indicia of judicial or quasi judicial decision-making" and was more akin to the regulatory hearings held by FERC. Boston Med. Ctr. Corp. v. Sec'y of Exec. Office of Health & Human Servs., 463 Mass. 447, 469 (2012).

Furthermore, suits for declaratory or injunctive relief or "to enjoin unconstitutional actions by state and federal officers [are] the creation of courts of equity." Armstrong v. Exceptional Child Ctr., Inc., ___ U.S. ___, 135 S. Ct. 1378, 1384 (2015). While "equitable remedies will be withheld if an applicable statute of limitations bars the concurrent legal remedy" if "legal and equitable claims coexist," Gilbert v. City of Cambridge, 932 F.2d 51, 57 (1st Cir. 1991), "[w]here a party cannot obtain concurrent relief by proceeding in either equity or law, however, a statute of limitations will not bar equitable relief." In re Boston & Maine Corp., No. 70-cv-00250-JLT, 2013 WL 6119313, at *2 (D. Mass. Nov. 19, 2013); see In re Valente, 360 F.3d 256, 266 n.7 (1st Cir. 2004) (declining to apply statute of limitations because plaintiff had no concurrent remedy at law). In this case, Algonquin seeks declaratory and injunctive relief on the issue of preemption to resolve a delay of its proceedings before the OADR officer, which is in turn delaying its ability to provide the appropriate state permits to FERC and begin building the Weymouth Compressor Station. Algonquin does not seek, and Defendants do not identify, any concurrent remedy at law that would make application of a statute of limitations defense appropriate. To the extent any limitations

period must be applied, in the absence of an "express limitations period[] from related federal statutes," the Court may consider the doctrine of laches. DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 162 (1983). If "the plaintiff has inexcusably slept on his rights so as to make a decree against the defendant unfair," a statute of limitations defense may be considered. Holmberg v. Armbrecht, 327 U.S. 392, 396 (1946). In this case, however, there is no suggestion Algonquin delayed seeking relief here or that Defendants are prejudiced by the speed with which they initiated this action. Accordingly, Algonquin's claims are not time barred, and Defendants' motion to dismiss is denied.

### B.     Motion for Summary Judgment

Algonquin seeks a ruling as a matter of law arguing that the WPO is preempted by the NGA and PSA's delegation of exclusive authority to FERC for regulation of interstate transportation and sale of natural gas.

#### 1.     *The Court Has Jurisdiction to Consider Algonquin's Claim*

Algonquin contends that it has standing to seek a declaratory judgment and that the Court has subject matter jurisdiction to hear this case. To establish standing, a plaintiff must show "a concrete and particularized injury in fact, a causal connection that permits tracing the claimed injury to the defendant's actions, and a likelihood that prevailing in the action will afford some redress for the injury." City of Bangor v. Citizens Commc'ns Co., 532 F.3d 70, 92 (1st Cir. 2008) (internal quotation marks omitted) (quoting Me. People's Alliance & Natural Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 283 (1st Cir. 2006)). The plaintiff does not need to show "the defendant's actions are the very last step in the chain of causation" but rather need only show that the "injury produced by determinative or coercive effect upon the action of someone else." Bennett v. Spear, 520 U.S. 154, 169 (1997). In this case, Defendants' "actions have directly affected the

federal regulatory processes that determine whether the [natural gas] [] project can proceed," Weaver's Cove Energy, LLC v. Rhode Island Coastal Resources Management Council, 589 F.3d 458, 467 (1st Cir. 2009), because they have had a "determinative or coercive effect" on the approval process. Bennett, 520 U.S. at 169. When extending the stay in the OADR action, over Algonquin's partial objection, the presiding officer specifically stated that the stay, which prevented resolution of WCC's appeal of the DEP's grant of an SOC for the AB Project, was merited to resolve the question of the WPO's preemption.[2] D. 7-1, ¶ 47. Furthermore, Algonquin is injured to the extent the AB Project and construction of the Weymouth Compressor Station have been delayed because of a state law which in this instance should be preempted. Weaver's Cove, 589 F.3d at 468.

The Court may grant declaratory judgment if there is an actual case or controversy between the parties, meaning "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007). As explained above, the parties are adverse to

---

[2] Defendants seek to raise two related arguments on this topic: first, that there is a question of fact as to whether their denial of an OOC "prohibited or unreasonably delayed" the AB Project; and second, that the NGA cannot preempt the WPO until the AB Certificate was fully executed with approval from the MCZM. Defendants do not raise any particularized facts in support of their argument. The injury in an NGA preemption action does not need to be the "exclusive reason federal approval has not been granted" so long as it had a determinative effect. Weaver's Cove, 589 F.3d at 467-68. In this case, the WCC's denial of an OOC, a prerequisite of certification by the MCZM, has delayed approval of the AB Project. D. 7-1, ¶ 18; D. 7-6 at 16. The alternative path to certification by the MCZM, an SOC by the Massachusetts DEP overriding the WCC's decision, is currently opposed by WCC and stayed pending resolution of the preemption question currently before the Court, a question created by WCC's application of the WPO to deny an OOC to Algonquin. D. 7-1, ¶ 47. The First Circuit in Weaver's Cove, 589 F.3d at 467-69, considered a preemption claim relating to an unapproved FERC application where other requisite agencies had not yet approved the application. Id. Accordingly, the Court rejects these arguments.

each other in a substantial controversy. The case is also ripe where review of a question of preemption when efforts to receive approval under the NGA "are ongoing" and redress would "clear a barrier to achieving approval for the project." Weaver's Cove, 589 F.3d at 468.

Finally, the Court has subject matter jurisdiction in this case because preemption is a federal question. Armstrong, 135 S.Ct. at 1384. Accordingly, the Court has jurisdiction in this case and may address the merits of Algonquin's motion.

### 2. *The WPO is Preempted by the NGA*

Preemption may be express or implied. Express preemption occurs when Congress has clearly defined the extent of preemption over state law. Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 541 (2001). Implied preemption has two subsets: conflict preemption and field preemption. A state law is preempted under conflict preemption when it either makes "compliance with both federal and state regulations [] a physical impossibility," Arizona v. United States, 567 U.S. 387, 399 (2012) (quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142–143 (1963)), or "stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," id. (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)). A state law is preempted under field preemption when Congress has "occupied the field" by creating "a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it'" or "where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" Id. (alterations in original) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).

Algonquin contends that all state and local law conditioning or preventing construction of interstate natural gas pipelines or related facilities conflicts with the NGA and is thus preempted, except for specific categories mentioned in the NGA's savings clause: the Coastal Zone

Management Act, the Clean Air Act and the Clean Water Act. Accordingly, Algonquin argues that the Weymouth WPO is preempted under conflict preemption.

The NGA explicitly gives FERC "exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal." 15 U.S.C. § 717b(e)(1). There are two exceptions to this broad grant of authority. First, except where expressly stated, the NGA does not limit "any Federal agency's authorities or responsibilities related to LNG terminals." 15 U.S.C. § 717b(e)(1). Second, the NGA does not affect "the rights of States" with respect to (1) the Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq.* ("CZMA"), (2) the Clean Air Act, 42 U.S.C. § 7401 *et seq.* ("CAA"), or (3) the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("FWPCA"). 15 U.S.C. § 717b(d).

The WPO, its implementing regulations and the WCC's denial of the request for an OOC are not promulgated under rights of States reserved by any of those three federal laws. However, the MCZM, the state body responsible for CZMA applications in Massachusetts, states in its "policy guide" that any application for a consistency concurrence must include the appropriate license or permit applications, including a Notice of Intent under the WPA. D. 7-6 at 16. The policy guide further states that MCZM will not concur if the relevant state permit is denied. Id. at 11. In other words, the MCZM within its CZMA authority that is expressly carved out from preemption by the NGA requires applicants such as Algonquin to have received a permit from local conservation committees such as the WCC.

This link between the MCZM and WPO does not save the denial of an OCC from preemption. As a threshold matter, it does not appear that the WPO was passed pursuant to the authority reserved to the states under the CZMA, CAA or FWPCA. "As such, [Defendants] ha[ve] failed to demonstrate that [their] laws are protected from preemption by one of the NGA's statutory

preemption exceptions." Dominion Transmission, Inc. v. Town of Myersville Town Council, 982 F. Supp. 2d 570, 579 (D. Md. 2013)

Even if Defendants were not obligated to take this affirmative position, the First Circuit has held that to the extent FERC considered the activity as a part of its consideration and approval of an application to construct an interstate natural gas facility, and authorized the activity, a contrary determination by a state agency pursuant to state law would be in conflict and thus preempted. See Weaver's Cove, 589 F.3d at 473–74. Similarly, other courts have found such applications of state and municipal law within the zone of issues considered by FERC to be conflict preempted. See Nat'l Fuel Gas Supply Corp. v. Town of Wales, No. 12-CV-034S, 2013 WL 5739033, at *4 (W.D.N.Y. Oct. 22, 2013) (noise levels); Dominion Transmission, 982 F. Supp. 2d at 578-79 (stormwater management and soil erosion); Colorado Interstate Gas Co. v. Wright, 707 F. Supp. 2d 1169, 1180-1181 (D. Kan. 2010) (natural gas storage); N. Nat. Gas Co. v. Munns, 254 F. Supp. 2d 1103, 1110-1112 (S.D. Iowa 2003) (environmental and economic maintenance of agricultural land); Algonquin Lng v. Loqa, 79 F. Supp. 2d 49, 52 (D.R.I. 2000) ("Loqa") (zoning site, safety, and construction).

The Weymouth WPO requires a permit from the WCC to, among other things, build on any relevant categories of wetlands. Weymouth passed the WPO to regulate water supply, ground water, flood control, erosion and sediment, storm damage, water quality, water pollution, fisheries, shellfish, wildlife, rare plants, aquaculture, recreation, aesthetics, and historical and archaeological preservation. WPO § 7-301(a). Specifically, the WCC denied Algonquin's request for an OOC and WPO permit because of concerns of excessive risk of explosions, damage to the facility because of hurricanes, and negative effects due to odors, noise and "visual impacts." As part of its environmental assessment, FERC had already considered these issues, determining that no

environmental impact study was required to proceed, and after the statutory comment period issued a certificate to Algonquin authorizing construction and operation of the compressor station. D. 7-1, ¶¶ 8-11. When FERC has already "carefully reviewed the very" proposal Defendants "seek[] to further regulate and, after considering environmental impacts, authorized the project," the WPO as applied to the AB Project "clearly collides with FERC's delegated authority and is preempted." Weaver's Cove, 589 F.3d at 473; see Nat'l Fuel Gas Supply Corp. v. Pub. Serv. Comm'n of State of N.Y., 894 F.2d 571, 579 (2d Cir. 1990) (noting that "direct consideration" of environmental effects by FERC "is more than enough to preempt state regulation").

Defendants point to several cases where preemption was found or rejected based upon a field preemption theory depending on the focus and intent of the state law in question. Some of these cases dealt with state laws outside FERC's review mandate and covering a wider swath of conduct beyond natural gas. See Oneok, Inc. v. Learjet, Inc., ___ U.S. ___, 135 S. Ct. 1591 (2015) (using private right of action in state antitrust laws to challenge natural gas price-fixing not preempted); Schneidewind v. ANR Pipeline Co., 485 U.S. 293 (1988) (state securities limiting issuance of securities by natural gas companies preempted). Other cases dealt with state laws intended to address "matter[s] traditionally for the States" to protect their own citizens' participation in the natural gas market. Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kansas, 489 U.S. 493, 518 (1989) (protecting correlative rights of in-state natural gas producers not preempted); see Exxon Corp. v. Eagerton, 462 U.S. 176, 184-185 (1983) (prohibiting pass-through severance tax by oil and gas producers preempted). These cases do not address the persuasive authority ruling that state laws or regulations within FERC's zone of review that are not promulgated pursuant to the CZMA, CAA or FWPCA either directly conflict with the NGA or frustrate FERC's ability to fulfill its congressional mandate.

Defendants also point to the fact that variances can be granted under the regulations promulgated pursuant to the WPO.  See D. 24-3 at 67.  This argument is not convincing for two reasons.  First, the regulation contemplates the possibility of granting a variance upon a showing that the proposed activity will "not have any adverse effect upon any of the interests protected in the Bylaw."  Id.  This is a standard above and beyond the one by which FERC considered environmental impacts of the Weymouth Compressor Station.  As laid out in the AB Certificate, FERC determined that an EIS was not needed based on a determination that the "federal action is not likely to have significant adverse effects."  D. 7-5 at 22.  Even if FERC had required an EIS, it is meant to determine whether the project "may significantly impact the environment."  Id.  FERC determined that "the impacts associated with this project can be mitigated to support a finding of no significant impact."  Id. at 23.  Second, the regulation contemplates the possibility of granting a variance upon a showing that the variance is necessary to avoid an unconstitutional taking without compensation.  D. 24-3 at 67.  Algonquin already operates a pipeline and a "Metering and Regulating Station" on its Weymouth property.  As the court noted in Loqa, 79 F. Supp. 2d at 52, the hypothetical availability of a regulatory taking variance cannot act as an escape valve from preemption when "such a showing would be impossible."  Id.

For all of aforementioned reasons, the WPO conflicts with the NGA and is preempted.[3]

---

[3] The Court notes that Algonquin argues alternatively that the PSA expressly preempts the Weymouth WPO.  The PSA provides that the Department of Transportation has exclusive authority to establish safety standards for interstate natural gas pipelines and facilities, and bars any "State authority" from "adopt[ing] or continu[ing] in force safety standards for interstate pipeline facilities or interstate pipeline transportation."  49 U.S.C. § 60104(c).  While other courts have held that the PSA expressly preempts state "regulating in the area of safety in connection with interstate hazardous liquid pipelines," Kinley Corp. v. Iowa Utilities Bd., 999 F.2d 354, 358 (8th Cir. 1993); see Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 880 (9th Cir. 2006); Williams Pipe Line Co. v. City of Mounds View, 651 F. Supp. 551, 566 (D. Minn. 1987), because

**VI.     Conclusion**

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss, D. 12, and ALLOWS Algonquin's motion for summary judgment. D. 7.

The Court is aware that Algonquin had claims for declaratory relief (Count I) and injunctive relief (Count II).  Since, however, Algonquin noted in its motion papers that it seeks declaratory relief (now granted) first and asks the Court only to retain jurisdiction in the event that it needs to seek injunctive relief, D. 7-2 at 21, the Court issues declaratory relief in the form of this Memorandum and Order, but does not issue injunctive relief at this time.  The Court shall retain jurisdiction in this matter for sixty (60) days.  Before the expiration of that period, Algonquin shall file a notice that no further action is needed, move for injunctive relief, or seek further extension of the Court's retention of jurisdiction for enforcement of this Order.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

the WPO does not uniquely apply to pipeline safety, it is not clear that it would be preempted here on this basis. See, e.g., Enbridge Energy v. Town of Lima, No. 13-CV-187-BBC, 2013 WL 12109106, at *4 (W.D. Wis. Apr. 4, 2013); Loqa, 79 F. Supp. 2d at 50; but see Webb v. Exxon Mobil Corp., No. 4:13-cv-00232-BSM, 2015 WL 11090403, at *6 (E.D. Ark. Mar. 17, 2015). Because the Court has concluded that the WPO is preempted by the NGA, the Court does not reach this issue.